# IN THE SUPREME COURT OF IOWA

No. 21–0540

Submitted October 20, 2021—Filed December 3, 2021

**IN THE INTEREST OF W.T.,** Minor Child,

**J.L.,** Father,

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Marshall County, Paul G. Crawford, District Associate Judge.

Dad seeks a delayed appeal from the juvenile court's termination of his parental rights. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which Christensen, C.J., and Appel and Mansfield, JJ., joined. Waterman, J., filed a dissenting opinion. McDermott, J., filed a dissenting opinion, in which Waterman and McDonald, JJ., joined.

Christopher A. Clausen of Clausen Law Office, Ames, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee.

**OXLEY, Justice.**

This appeal involves the termination of a dad's parental rights. Dad filed his notice of appeal one day late and asks us to grant his request for a delayed appeal. For the reasons discussed below, we grant Dad's request and, on our de novo review, affirm the juvenile court's order terminating his parental rights.

I.

This case was brought to the department of human service (DHS)'s attention when it was reported Mom allowed a registered sex offender to stay overnight with her and her three children, including W.T. Mom agreed with DHS that this was a bad idea. She was arrested for child endangerment and jailed after it happened again. The juvenile court granted DHS's removal order, and all three children were placed in foster care. The State filed a child-in-need-of-assistance (CINA) petition in November 2019. Mom identified Dad as W.T.'s father, and paternity testing confirmed he was her biological father in mid-March 2020. Dad lived in Arizona, and a home study was started. By then, W.T. was six months old.

Dad returned to Iowa in July for his brother's graduation and ended up staying when, in his words, he "got stranded." DHS met with him later that month. A provider scheduled a visit between Dad and W.T. in August, which Dad cancelled. DHS made contact with Dad nearly every month after that, but Dad did not even meet W.T. until January 17, 2021, four days before the termination hearing. In the meantime, the State moved to terminate Mom's and Dad's parental rights on November 4, 2020 because Mom was not in a position to

provide for the needs of the child, and Dad had not engaged in services or even met W.T. even though he had moved back to Iowa in July. When Dad finally met W.T. on January 17, 2021, she clung to the provider during the first half of the two-hour visit because she had never met Dad and was scared. She eventually warmed up to Dad, but as the provider testified, they couldn't have been bonded after that one short visit.

At the time of the hearing on January 21, Dad lacked a stable income, having just started working part-time doing odd jobs for his landlord for an undetermined amount of pay. Dad was living with a woman whose parental rights to her own children had previously been terminated, which raised concerns for DHS. The DHS case manager also expressed concerns at the termination hearing about W.T.'s emotional state if she was separated from her half sister, who was in the same foster placement. The juvenile court concluded the State proved the grounds for termination and terminated Mom's and Dad's parental rights on April 6.

The deadline to appeal was April 21. *See* Iowa R. App. P. 6.101(1)(*a*). Mom did not appeal. Dad appealed but filed the notice of appeal on April 22—one day late. Recognizing the untimeliness of the notice, Dad's counsel filed a motion for a delayed appeal, explaining: "The undersigned conferred with the father who wishes to appeal. The undersigned had calendared the deadline to appeal based on the date of notification of April 8, 2021, in error." We ordered the motion be submitted with the appeal.

We transferred the case, and the court of appeals denied Dad's request for a delayed appeal because the late filing was based on attorney inadvertence and was not attributable to any extenuating circumstances. We granted Dad's application for further review to further define the parameters of delayed appeals in the context of chapter 232 appeals.

II.

We begin by determining whether we can hear Dad's appeal. Although an untimely appeal from a termination-of-parental-rights (TPR) order results in dismissal of the appeal, *see In re J.H.*, 952 N.W.2d 157, 165 (Iowa 2020), we recently extended our delayed appeal jurisprudence involving criminal appeals to TPR appeals under limited circumstances, *see In re W.M.*, 957 N.W.2d 305 (Iowa 2021) (granting father a delayed appeal when his notice of appeal was filed two days late); *In re A.B.*, 957 N.W.2d 280 (Iowa 2021) (granting father a delayed appeal when the petition on appeal, required to perfect his appeal under rule 6.201(3), was filed two days late). In the TPR context, we said a delayed appeal is proper "only where the parent clearly intended to appeal," the "failure to timely perfect the appeal was outside of the parent's control," and the delay was "no more than negligible." *In re A.B.*, 957 N.W.2d at 292.

In *In re A.B.*, the father's intent to appeal was obvious from his timely-filed notice of appeal, his counsel was responsible for missing the deadline for filing the petition on appeal, and the two-day delay "did not unnecessarily prolong the appeal process." *Id.* at 293. We reached a similar conclusion in *In re W.M.*, where an incarcerated father's intent to timely appeal was shown by his return of the

signed notice of appeal to his attorney postmarked on the deadline for filing the notice, the prison transfer and mail situation that delayed the father's receipt of the order and notice from his attorney was beyond the father's control, and the belated notice of appeal did not delay the proceedings where the petition on appeal was still filed within thirty days of the juvenile court's termination order. 957 N.W.2d at 316–17.

Here, Dad argues the same standard applies to him because he clearly intended to appeal, the failure to timely perfect the appeal was his attorney's fault, not his, and the appeal process was not delayed by the one-day-late filing of the notice of appeal where the petition on appeal was still filed within thirty days of the termination order, just as in *W.M.* Dad contends the only thing missing is a "statement of extenuating circumstances," a reference to footnote 4 in *In re A.B. See* 957 N.W.2d at 293 n.4. There, we cautioned:

> That is not to say an attorney's inadvertent failure to properly calendar the deadline for a petition on appeal will entitle her client to a delayed appeal. Such would effectively write our "no extensions" provision out of the rules, which we have no intention of doing. Rather, we recognize the extenuating circumstances in this case involving the heightened quarantining practices required by the coronavirus . . . .

*Id.* We must now decide whether footnote 4 adds an extenuating circumstances requirement that precludes parents from receiving appellate review of their termination order when their attorney misses the appeal deadline for a less than

extenuating reason, i.e., an inadvertent or negligent reason.[1] We conclude it does not.

The constitutionally-grounded liberty interests involved in parental rights termination proceedings, coupled with the lack of recourse for a parent whose appeal is not properly perfected through no fault of their own, led us to extend to parental rights termination proceedings the standard for allowing delayed appeals we have long used in criminal cases. *In re A.B.*, 957 N.W.2d at 290 (discussing delayed appeals in the criminal context "as a remedial procedure that excuses a party's failure to timely perfect their appeal in the very limited situation 'where it appears that state action or other circumstances beyond appellant's control have frustrated an intention to appeal' and denial of the right to appeal implicates the appellant's constitutional rights" (quoting *Swanson v. State*, 406 N.W.2d 792, 793 (Iowa 1987))). Yet we balanced the parent's interests against the children's significant interest in reaching "finality so they can move forward

---

[1] There have been nine Iowa Court of Appeals decisions discussing delayed appeals in TPR cases since our *In re A.B.* decision. In six cases, the court of appeals granted the delayed appeal based on the negligible delay without mentioning extenuating circumstances and disposed of the case on its merits. *See In re C.B.*, No. 21–0814, 2021 WL 4303660 (Iowa Ct. App. Sept. 22, 2021); *In re D.T.*, No. 21–0396, 2021 WL 3661414 (Iowa Ct. App. Aug. 18, 2021); *In re T.F.*, No. 21–0243, 2021 WL 3076866 (Iowa Ct. App. July 21, 2021); *In re M.B.*, No. 21–0306, 2021 WL 2452056 (Iowa Ct. App. June 16, 2021); *In re J.S.*, No. 20–1577, 2021 WL 2452052 (Iowa Ct. App. June 16, 2021); *In re R.E.*, No. 21–0090, 2021 WL 2137668 (Iowa Ct. App. May 26, 2021). In the other three, the court of appeals denied the parents' request for a delayed appeal because there was no showing of extenuating circumstances. *See In re K.D.*, No. 21–0070, 2021 WL 4889066 (Iowa Ct. App. Oct. 20, 2021); *In re C.R.*, No. 21–0630, 2021 WL 4303584 (Iowa Ct. App. Sept. 22, 2021); *In re W.T.*, No. 21–0540, 2021 WL 3076284 (Iowa Ct. App. July 21, 2021). *In re K.D.*, discussed by the dissent, is a poster child for why extenuating circumstances should not be required when the delay is the attorney's fault. 2021 WL 4889066. There is no reasoned justification for cutting off a parent's right to appeal when the appeal was filed thirty-two seconds late because of technical issues with the electronic document management system (EDMS), *see id.* at *2–3, if the same appeal would have been allowed if the attorney could have articulated a more compelling circumstance that caused the delay.

with a permanency plan" by adding an additional qualifier that the delay can be "no more than negligible." *Id.* at 292; *see also In re W.M.*, 957 N.W.2d at 316. We thus established a two-part approach for delayed appeals in TPR cases. The first part mirrors our criminal case approach: a delayed appeal is proper if the client intended to appeal on time and was not able to do so due to circumstances beyond the client's control. But given the strong countervailing interests involved in termination proceedings, we added a second component requiring that any resulting delay be negligible.

Whether counsel has a good reason, a bad reason, or no reason at all for failing to timely file a notice of appeal makes no difference to the parent who just lost the chance to appeal the juvenile court's termination decision. Further, when the delay is caused by counsel's negligence, additional concerns about whether the attorney rendered ineffective assistance come into play. Parents named in a chapter 232 termination petition have a statutory right to counsel, including appointed counsel for parents who cannot afford their own. Iowa Code § 232.113(1) (2021). The statutory reference to "all . . . proceedings" no doubt includes the right to counsel on appeal.[2] We have recognized that due process requires that the statutory right to counsel comes with it the right to effective counsel. *See In re D.W.,* 385 N.W.2d 570, 579 (Iowa 1986) (assuming, based in

---

[2]*See In re Chambers,* 152 N.W.2d 818, 821 (Iowa 1967) (holding that under newly-enacted statutory right to appeal, coupled with newly-enacted statutory right to counsel for termination proceedings, "the appointment of counsel to represent plaintiff should continue through all stages of the proceedings including an appeal as authorized by statute"); *see also In re C.M.,* 652 N.W.2d 204, 207 (Iowa 2002) (addressing constitutionality of expedited appeal process, first raised in application for further review, as claim that appellate counsel was ineffective for failing to identify issue in petition on appeal).

part on state's concession, that "due process requires counsel appointed under a statutory directive to provide effective assistance"), *modified on other grounds by In re J.P.B.*, 419 N.W.2d 387 (Iowa 1988). Given the constitutional interests involved in termination proceedings, we have addressed issues raised on appeal that were not presented in the juvenile court under an ineffective assistance analysis. *See, e.g.*, *In re J.P.B.*, 419 N.W.2d at 388–89 (addressing whether mom's counsel was ineffective for failing to object to alleged conflict of interest arising from representation of both children by same counsel where one child favored and other child opposed termination).

Our prior recognition of the availability of ineffective-assistance-of-counsel claims in termination proceedings convinces us that there is no need to show extenuating circumstances to support a delayed appeal when the attorney is at fault for filing a late notice of appeal. Indeed, it counsels the opposite conclusion. Failing to file a timely notice after the client has instructed the appeal to be filed is professionally unreasonable. *See Roe v. Flores-Oretga*, 528 U.S. 470, 477, (2000) ("We have long held that a lawyer who disregards specific instructions from the [criminal] defendant to file a notice of appeal acts in a manner that is professionally unreasonable."). The parent's inability to proceed with the appeal would satisfy a showing of prejudice. *See In re A.R.*, 483 P.3d 881, 892 (Cal. 2021) (allowing delayed appeal in termination case, explaining: "To ascertain prejudice, we focus on whether the parent would have taken a timely appeal, without requiring the parent to shoulder the further burden of demonstrating the appeal was likely to be successful."); *People In re A.J.*, 143

P.3d 1143, 1149 (Colo. App. 2006) (allowing delayed appeal in termination case, similarly explaining: "[T]he appellant is not required to demonstrate that his appellate claims are meritorious, because the 'prejudice resulting from the failure to file a notice of appeal is not in the outcome of the proceeding, but in the forfeiture of the proceeding itself.' " (quoting *People v. Long*, 126 P.3d 284, 286 (Colo. App. 2005))).

We make clear we are not analyzing Dad's motion for delayed appeal as if he has asserted an ineffective-assistance claim; neither Dad nor the State has advocated as such. Rather, the interests protected by and the analysis applied in ineffective-assistance claims convince us that our delayed appeal analysis should not turn on the strength or weakness of counsel's explanation for missing the appeal deadline. We maintain the negligible delay requirement as a critical component of our delayed appeal analysis, recognizing that a parent whose counsel provides ineffective assistance resulting in more than a negligible delay will nonetheless not be entitled to a delayed appeal.

Having recognized the need for delayed appeals in termination proceedings to protect a parent's constitutionally-based interests, the reason counsel failed to file a timely notice of appeal is irrelevant to our reasoning in allowing the appeal to go forward. Limiting delayed appeals to only those where counsel can show extenuating circumstances would necessarily require a case-by-case determination of whether extenuating circumstances exist, leading to extended litigation within each case and ultimately causing delay in the court's ability to

reach the case's merits.[3] On the other hand, not requiring counsel to articulate an extenuating circumstance streamlines the process into a motion practice that will turn primarily on whether the delay was negligible, allowing the appeal to proceed to a quicker determination of the merits. Our rules have expedited, not eviscerated, a parent's ability to appeal the termination of their parental rights.

Nor does our decision today put Dad's interests above W.T.'s. Notably, our precedent and appellate rules governing termination appeals are replete with procedures that prioritize the child's interest in finality over the rights of parents. For example, not only must the notice of appeal and the petition on appeal be filed on an expedited basis, parents are restricted to presenting their arguments in a petition on appeal that may not exceed twenty pages and is limited in content because our rules direct the appellant to raise issues for appeal rather than arguing them in depth in an appellate brief. *See* Iowa R. App. P. 6.201(1)(*c*)–(*d*). These petitions on appeal are often submitted based on the parents' and attorneys' memories of the termination proceedings because they are typically due before the transcripts are available. *See In re T.S.*, 868 N.W.2d 425, 433 (Iowa Ct. App. 2015). We have upheld this procedure "[e]ven in the extraordinary situation where trial counsel does not prepare the petition on appeal" and a new attorney is forced to handle the appeal without access to the trial transcript

---

[3]*In re K.D.* shows the individualized case-by-case analysis required to determine whether the reason for an attorney's late filing could be considered extenuating or not. *See* 2021 WL 4889066. After attempting for two-and-a-half hours to file the notice of appeal through EDMS, the attorney's assistant was finally successful—thirty-two seconds after the midnight deadline. *Id.* at *1. The court of appeals recognized "a case can be made for allowing a delayed appeal" where the three *In re A.B.* prerequisites were satisfied, but then analyzed the EDMS rules to determine the attorney's technical problems were not extenuating. *Id.* at *1–2.

because doing so was in the child's best interest to finalize the termination procedure. *Id.* at 434 (emphasis omitted) (quoting *In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002)). Further, we prohibit parties in termination appeals from filing a reply to the response to their petition on appeal, Iowa R. App. P. 6.203, or a resistance to applications for further review unless we specifically request it, *id.* r. 6.1103(2)(*a*).

Undoubtedly, "[i]t is in the best interests of children for the court process to proceed without delay, but it is also in the best interests of children that their parents have a full and fair opportunity to resist the termination of parental rights." *In re M.D.*, 921 N.W.2d 229, 236–37 (Iowa 2018) (holding imprisoned parent is entitled to participate in entire hearing, not just during her testimony, recognizing the additional expense and time to make the required arrangements are "needed to ensure fairness in hearings where so much is at stake" ). Thus, despite what we said in the *In re A.B.* footnote, we do not require extenuating circumstances in addition to the three factors we identified when the missed deadline is caused by attorney inadvertence.

We confirm that a delayed appeal is allowed "only where the parent clearly intended to appeal," the "failure to timely perfect the appeal was outside of the parent's control," and the delay was "no more than negligible." *In re A.B.*, 957 N.W.2d at 292. We clarify that when the failure is counsel's fault, the reason is irrelevant. Dad has met those requirements, and we proceed to consider his appeal.

III.

We review termination of parental rights de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019); *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). We are not bound by the factual findings of the juvenile court, but we give them weight, particularly regarding credibility determinations. *In re M.W.*, 876 N.W.2d at 219.

In analyzing whether parental rights should be terminated, we use the three-part process from Iowa Code section 232.116 and determine (1) whether the State proved any grounds for termination, (2) whether termination is in the child's best interests, and (3) whether any exceptions save the parent–child relationship. *See* Iowa Code § 232.116(1)–(3); *In re A.B.*, 957 N.W.2d at 299. The State must prove termination was proper by clear and convincing evidence. *In re A.B.*, 957 N.W.2d at 294; *In re A.M.*, 843 N.W.2d 100, 110–11 (Iowa 2014). "[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination" identified in section 232.116(3). *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). Upon our de novo review, we affirm the juvenile court's decision terminating Dad's parental rights.

The State sought to terminate Dad's parental rights pursuant to Iowa Code section 232.116(1)(*e*) and 232.116(1)(*h*). For purposes of paragraph (*h*), the only disputed issue is whether W.T. could have been placed in Dad's custody at the time of the hearing. *Id.* § 232.116(1)(*h*)(4). For purposes of paragraph (*e*), the only fighting issue is whether Dad had maintained significant and meaningful contact with W.T. during the past six months and made no reasonable effort to resume care of her despite having the opportunity to do so. *Id.* § 232.116(*e*)(3). Significant

and meaningful contact includes "the affirmative assumption by the parents of the duties encompassed by the role of being a parent." *Id.* In addition to financial obligations, this affirmative duty "requires continued interest in the child . . . a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life." *Id.*

Dad acknowledges that he could have acted more quickly and done more to get to know W.T. before the termination hearing, but argues he did enough to preclude termination because W.T. could have been placed with him, if not immediately then certainly within six months of the hearing. *See* Iowa Code § 232.117(5) (if juvenile court does not terminate parental rights it may enter an order under section 232.104); *see also id.* § 232.104(2)(*b*) (juvenile court may "enter an order pursuant to section 232.102 to continue placement of the child for an additional six months").

We agree with the juvenile court that the State proved by clear and convincing evidence that the bases for termination under both paragraphs (*e*) and (*h*) were satisfied. Dad had ample opportunity to meet with and participate in W.T.'s life during the relevant six-month period between July 2020, when he moved to Iowa, and January 2021, when his parental rights were terminated. Nonetheless, despite being told several times that he needed to make arrangements to see W.T. or he could lose the opportunity, and having months to set up a meeting, Dad made very little effort to become part of W.T.'s life. He met her for the first time four days prior to the termination hearing. He did not contribute financially for W.T., make arrangements for her to live in his home,

or even seek to learn anything about her. Further, Dad's living arrangements were not satisfactory to DHS. He lived with a girlfriend whose own parental rights had been terminated because of drug use. Dad had only a part-time job, and his girlfriend was his sole source of transportation and the primary source of income for their shared household. His only explanation was that he was too busy looking for a job and had transportation problems that prevented him from meeting W.T. sooner. That is not the type of "reasonable efforts to resume care" required to avoid termination under paragraph (*e*) and does not ameliorate the issues DHS had with his current living arrangements to allow W.T. to be returned to his care under paragraph (*h*). The State proved the grounds for terminating Dad's parental rights under both paragraphs (*e*) and (*h*). *See In re A.B.*, 957 N.W.2d at 299–300 (affirming termination of father's parental rights pursuant to section 232.116(1)(*h*) where he only participated in visitation sporadically and DHS worker testified he could not be a primary caretaker due to his ambivalence); *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (en banc) ("A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting.").

With respect to Dad's request for more time, the juvenile court may deny termination and give the parent an additional six months for reunification only if the need for removal "will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(*b*); *see also In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) ("In order to continue placement for six months, the statute requires the court to make a determination the need for removal will no longer

exist at the end of the extension."). Not only must Dad show the impediments to placing W.T. with him will not exist in six months, we must also consider whether the further delay is in W.T.'s best interests. Iowa Code § 232.116(2). In doing so, we

> "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." . . . For integration [with a foster family], we look at how long the child[] ha[s] been living with the foster family, how continuity would affect the child[], and the preference of the child[] if they are capable of expressing a preference.

*In re M.W.*, 876 N.W.2d at 224 (citations omitted) (quoting Iowa Code § 232.116(2) (2013)).

Again, we agree with the juvenile court that Dad failed to prove W.T. could safely be placed with him if given more time. Dad had a part-time job, relied on his girlfriend for financial support and transportation, expressed no intentions of moving out of the girlfriend's home, and there was no indication DHS would approve of W.T. living with the girlfriend. In addition, W.T. and her half sister are currently placed together with foster parents willing to adopt both girls. The DHS case manager expressed concerns about W.T.'s emotional state if she is separated from her sister. Termination of Dad's parental rights was in W.T.'s best interest. *See id.* ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." (quoting *In re A.M.*, 843 N.W.2d at 112)).

Finally, we must "determine whether any exceptions in section 232.116(3) apply to preclude the termination." *Id.* at 225. The exceptions "in section 232.116(3) are permissive, not mandatory." *In re A.M.*, 843 N.W.2d at 113 (quoting *In re D.S.*, 806 N.W.2d 458, 474–75 (Iowa Ct. App. 2011)).

Dad argues his rights should not have been terminated because of his bond with W.T., invoking subsection (3)(*c*) requiring "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(*c*). On our de novo review of the record, we agree with the juvenile court that such a bond did not exist. The evidence showed W.T. was scared when she first met Dad because it was the first, and at the time of the hearing only, time they had met. That she eventually warmed up enough to give him a hug and blow him kisses by the end of the two-hour meeting does not establish the type of bond that would make termination in this case improper. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) (explaining that "our consideration must center on whether the child will be disadvantaged by termination," not whether the parent loves the child); *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010) ("We do not find a closeness of the parent-child relationship. Father and daughter were just getting to know each other. The father stated in the months of contact with his child he was just able to learn to love her. Accordingly, this exception will not prevent the termination."). Dad had several months to form a close relationship with W.T. and simply neglected to do so. Dad failed to establish this exception should have prevented termination of his parental rights.

IV.

We grant Dad's application for delayed appeal and affirm the juvenile court's termination of Dad's parental rights as to W.T.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Christensen, C.J., and Appel and Mansfield, JJ., join this opinion. Waterman, J., files a dissenting opinion. McDermott, J., files a dissenting opinion, in which Waterman and McDonald, JJ., join.

**WATERMAN, Justice (dissenting).**

I respectfully dissent and would affirm the court of appeals decision denying the father's motion for a delayed appeal and dismissing this appeal as untimely. I join Justice McDermott's dissent and write separately to explain additional reasons I disagree with the majority opinion. The court of appeals correctly applied our precedent governing delayed appeals which required a showing of extenuating circumstances lacking here. *See In re A.B.*, 957 N.W.2d 280, 292–93, 293 n.4 (Iowa 2021). *In re A.B.* for the first time allowed untimely appeals from orders terminating parental rights (TPR), but only if extenuating circumstances justify the delay. *Id.* In that opinion filed April 2 of this year, we pointedly warned that "an attorney's inadvertent failure to properly calendar the deadline" would *not* entitle the client to a delayed appeal, because to hold otherwise "would effectively write our 'no extensions' provision out of the rules, which we have no intention of doing." *Id.* at 293 n.4. Today, we eat those words. I joined *In re A.B.* based on that extenuating circumstances requirement, which the majority unwisely abandons now. Without that important limitation, my colleagues' well-reasoned partial dissent should carry the day. *See id.* at 301–05 (McDermott, J., concurring in part and dissenting in part).[4]

I understand the impulse to avoid seemingly harsh results when deadlines are enforced. But for many years, until 2020, we dismissed appeals from TPR

---

[4]Because this appeal is untimely, I would not reach the merits. If this appeal had been timely filed, I would join part III of the majority opinion which affirms the well-reasoned juvenile court termination order.

orders when the notice of appeal or petition on appeal was late, even by a day. What do we say now to those disappointed appellants? And after *In re A.B.*, we have continued to strictly enforce appellate deadlines in other types of civil appeals. *See, e.g., Valles v. Mueting*, 956 N.W.2d 479, 481, 484–85 (Iowa 2021) (dismissing the mother's untimely appeal in a medical malpractice action alleging the defendant doctors' misdiagnosis caused her child's catastrophic disabling injuries).

A common denominator in all appeals is the need for clarity, predictability, and even-handed enforcement of the rules. Those values are sacrificed when our court not only excuses compliance with strict deadlines, but then abandons a requirement for such relief—extenuating circumstances—that we specified in *In re A.B.* earlier this year. Instead of honoring stare decisis, the majority retreats from that precedent. *See Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015) ("Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law.").

I'm not persuaded by the majority's revisionist history that now asserts what we said in *In re A.B.* about extenuating circumstances was just an observation about the facts in that case, not an additional requirement for relief. The court of appeals panel in this case interpreted what we said last April the same way I did, requiring extenuating circumstances for a delayed appeal, stating the requirement "makes sense, as its absence would allow attorneys to ignore the time for filing a notice of appeal, argue said ignorance was simply attorney inadvertence in calendaring, and bypass appellate jurisdictional

requirements. Absent extenuating circumstances, that would be an absurd result."

Two other panels of the court of appeals concluded we meant what we said and required a showing of extenuating circumstances. *In re K.D.*, No. 21–0070, 2021 WL 4889066, at *2–3 (Iowa Ct. App. Oct. 20, 2021) ("We interpret the holding in *A.B.* as imposing an extenuating-circumstances requirement together with the aforementioned requirements of intent to appeal, no fault of the parent, and negligible delay."); *In re C.R.*, No. 21–0630, 2021 WL 4303584, at *1 (Iowa Ct. App. Sept. 22, 2021) ("[W]hile cases have allowed for delayed appeals when the delay is due to an attorney's tardiness, the supreme court is clear that this is appropriate only when the failure is coupled with some extenuating circumstance."). All three panels were unanimous, with a total of seven judges of the court of appeals participating.

The majority justifies abandoning the extenuating circumstances requirement we adopted just last April to avoid "extended litigation" to determine "case-by-case" whether that showing is made. That still leaves more case-by-case litigation ahead "to figure out where to draw the line in future cases with no extenuating circumstances. Is an hour too long? A day? A week?" *In re K.D.*, 2021 WL 4889066, at *3. I am now convinced we embarked on a fool's errand by allowing delayed appeals, and should return to our longstanding practice of simply enforcing the rules as written. *See id.* ("Our rules of appellate procedure have already drawn that line. It is fifteen days . . . ."). In every Iowa case allowing a delayed appeal this year (including today's decision and the appeals listed in

footnote 1 of the majority opinion), the juvenile court's order terminating the tardy appellant's parental rights was affirmed on the merits. Yet allowing these late appeals delayed finality and permanency for the children involved by many months. To what gain?

Chapter 232 TPR appeals are different than other civil appeals, but the key difference—the focus on the best interest of the child—cuts in favor of *enforcing* the accelerated deadlines. *See In re A.B.*, 957 N.W.2d at 292 (majority opinion) (reaffirming precedent rejecting equal protection and due process challenges by parents to the expedited deadlines, and reiterating that "the expedited appeal process is 'narrowly tailored to address the State's compelling interest' in providing permanency." (quoting *In re C.M.*, 652 N.W.2d 204, 211 (Iowa 2002))). "[O]ur focus [is] on the best interests of the child, since the parties—and importantly the children—are in a state of limbo while the wheels of justice grind through the appeal process." *Id.* at 291. We should not convert a "child protection system" into a "parent protection system." *In re Welfare of the Child of R.K.*, 901 N.W.2d 156, 165 (Minn. 2017) (Gildea, C.J., dissenting).

The Minnesota Supreme Court declined to allow delayed appeals in TPR cases when, as here, the attorney simply missed an appellate deadline without extenuating circumstances. *In re Welfare of J.R.*, 655 N.W.2d 1, 4–6 (Minn. 2003) (en banc) (dismissing TPR appeal for two-week delay in serving the guardian ad litem). In my view, that court properly balanced the competing considerations, as follows:

While it is true that strict application of the rules of procedure may result in some cases not being heard on appeal, equally true is that injustice may result to the children by not enforcing the deadlines set forth in the rules. The dismissal of an untimely appeal does not occur in a vacuum. Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement. . . .

[T]he prolonged uncertainty for children of not knowing whether they will be removed from home, whether and when they will return home, when they might be moved to another foster home, or whether and when they may be placed in a new permanent home is frightening. This uncertainty can seriously and permanently damage a child's development of trust and security.

Accordingly, we stand with the appellant in her assertion that these cases are extremely important, but we part company with her singular focus on the parents.

Fundamental to this heightened concern for abused and neglected children is the growing understanding that time for a child is different than time for adults. We need to recognize that from a child's view, a delay is a delay regardless of the reason. To a child, time lost because of innumerable opportunities given to parents to complete a case plan is no different than time lost when courts allow parents more time then is set forth in the rules to perfect an appeal. While we recognize and support due process rights of all parties, we decline the invitation to elevate the parents' rights at the expense of the child's.

*Id.* at 5 (citations omitted) (quoting Nat'l Council of Juv. and Fam. Ct. Judges, *Adoption and Permanency Guidelines: Improving Court Practice in Child Abuse and Neglect Cases* 5 (2000)). For the same reasons, I would strike the balance in the child's favor and decline to allow a delayed appeal when the parent's lawyer miscalculated the deadline.

We are not arguing over a mere one-day delay. This appeal should have been dismissed under *In re A.B.* last April when the father's attorney candidly

admitted in his untimely notice of appeal that he simply "had calendared the deadline to appeal . . . in error." The permanency W.T. deserves under our appellate rules and chapter 232 should have occurred last spring. We could have and should have avoided the ensuing seven-month delay—a significant length of time for this young child to be left in limbo. For these reasons, I am unable to join the court's opinion, and I join Justice McDermott's dissent in full.

**McDERMOTT, Justice (dissenting).**

I respectfully dissent from the majority's grant of the untimely appeal in this case for the reasons stated in my concurrence in part and dissent in part in *In re A.B.*, 957 N.W.2d 280, 301–05 (Iowa 2021) (McDermott, J., concurring in part and dissenting in part). Once again, I believe that the law requires us to dismiss late-filed appeals, based on our lack of jurisdiction to hear them, without analyzing the ad hoc exceptions that we've now grafted onto our deadlines. The father admits that he failed to file his notice of appeal as required by Iowa Rule of Appellate Procedure 6.101(1)(*a*). Appeal deadlines, we have long declared, are "mandatory and jurisdictional." *Root v. Toney*, 841 N.W.2d 83, 87 (Iowa 2013) (quoting *In re Marriage of Mantz*, 266 N.W.2d 758, 759 (Iowa 1978)).

That should be the end of the inquiry. The deadlines impose a limit on the court's jurisdiction that we should not take upon ourselves to extend through extemporaneous suspensions of enforcement on a case-by-case basis. These rules are indispensible to an orderly system of justice. *Houston v. Lack*, 487 U.S. 266, 283 (1988) (Scalia, J., dissenting). By permitting parties ad hoc dispensations, our court makes unclear and indefinite deadlines intended to provide clarity and finality, and at the same time signals that important appeal deadlines are neither important nor deadlines.

Waterman and McDonald, JJ., join this dissent.